# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

BILLY SAINTFELIX,

     Plaintiff,

v.

CITY OF ORLANDO,

     Defendant.

Case No: 6:25-cv-00580-JSS-DCI

## FIRST AMENDED COMPLAINT

Billy Saintfelix ("Plaintiff" or "Mr. Saintfelix"), hereby files this First Amended Complaint against and Defendant City of Orlando ("Defendant") and states the following:

## PRELIMINARY STATEMENT

1.    Mr. Saintfelix is a college-educated and exceptionally qualified firefighter possessing certifications in Basic Life Support (CPR and AED), Pediatric Advanced Life Support ("PALS"), Advanced Cardiovascular Life Support ("ACLS"), Florida Incident Safety (ATCP6742), Vehicle and Machinery Operations – Level I, Trucking Operations, Emergency Vehicle Operations (FCDICE 98379), Rope Rescue Operations, and Trench and Excavation Rescue Operations. He also maintains current certifications as a Florida State Firefighter, EMT, and Paramedic. Despite these exceptional qualifications, Defendant, by and through the City of Or-

lando Fire Department ("COFD"), subjected Mr. Saintfelix to unlawful discrimination, retaliation, and a hostile work environment.

2. Mr. Billy Saintfelix's constructive termination by COFD represents a coordinated scheme of intentional disability discrimination, racial discrimination, and retaliation designed to manufacture and conceal a pretextual paper trail to cover up his constructive termination. Defendant deliberately hired Mr. Saintfelix—an exceptionally qualified Black (Haitian-born) firefighter with Pseudofolliculitis Barbae ("PFB")—despite knowing his visible medical condition, granted him an accommodation, and then systematically subjected him to daily harassment, escalating unsubstantiated write-ups, and coordinated inspections until he was forced to resign. This pattern of conduct violates the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213 ("ADA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and Florida law.

## JURISDICTION

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this is a civil action arising under the ADA and Title VII of the Civil Rights Act of 1964. This Court has supplemental jurisdiction over Mr. Saintfelix's state law claims pursuant to 28 U.S.C. § 1367.

4. Personal jurisdiction and venue are proper in this district because Mr. Saintfelix worked for Defendant in Orange County, Florida, and a substantial part

of the events—including interactions with City leadership, the mask fit test, panel interview, daily inspections, write-ups, and termination—occurred in this district.

## PARTIES

5.      Plaintiff, Mr. Saintfelix, is and was at all times relevant to this action a citizen and resident of Orange County, Florida. Mr. Saintfelix is an African American male of Haitian descent.

6.      Mr. Saintfelix was employed by the City of Orlando Fire Department as a Firefighter/Paramedic from July 18, 2022, until his constructive termination on November 26, 2022.  He is an "employee" within the meaning of the ADA, 42 U.S.C. § 12111, and Title VII, 42 U.S.C. § 2000e.

7.      Mr. Saintfelix served as a firefighter for roughly three years before transitioning to the City of Orlando Fire Department in July 2022, demonstrating his exceptional skills, qualifications, and professional ability.

8.      Defendant, City of Orlando, is and was at all relevant times operating in Orange County, Florida, and is within the jurisdiction of this Court. The City of Orlando is responsible for the Fire Department and maintains, operates, and governs the COFD as its direct agency. The City of Orlando is an "employer" within the meaning of the ADA, 42 U.S.C. § 12111, and Title VII, 42 U.S.C. § 2000e(b), employing more than 15 persons.

9.    At all relevant times, the City of Orlando acted through COFD leadership—including Executive Deputy Fire Chief Ian Davis ("EDFC Davis"), Deputy Fire Chief Kevin Preston ("DFC Preston"), Chief Craig Hulette ("Chief Hulette"), Lieutenant Jacquelyn Pollock ("LT Pollock"), and District Chief Creed McClelland ("DC McClelland")—to commit the unlawful acts alleged herein and was responsible for such unlawful conduct.

## CONDITIONS PRECEDENT

10.    Mr. Saintfelix is an African American male of Haitian descent who suffered discrimination and retaliation based on his race, national origin, and disability. As such, he is a member of protected classes under Title VII and the ADA.

11.    Mr. Saintfelix was a qualified individual for the Firefighter/Paramedic position because he satisfied all objective minimum qualifications established by Defendant, including:

    a.    Possessed a high school diploma, GED, or equivalent;

    b.    Over the age of 18;

    c.    Passed a background check;

    d.    Has U.S. Citizenship;

    e.    Passed FireTeam and CPAT exams;

    f.    Has good moral character;

    g.    Remains in good physical condition;

    h.    Does not use tobacco products; and

    i.    Completed a state-approved course for firefighter certifications.

12.     On April 19, 2023, Mr. Saintfelix timely filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") alleging disability discrimination, race discrimination (inherently including national origin discrimination), and retaliation.

13.     On January 06, 2025, the EEOC issued Mr. Saintfelix a Notice of Right to Sue. has been filed within 90 days of receipt of that notice. Mr. Saintfelix has fully complied with all prerequisites to jurisdiction in this Court under the ADA and Title VII of the Civil Rights Act of 1964.

14.     Therefore, the initial Complaint in this action was filed within 90 days of Mr. Saintfelix's having received his right-to-sue letter.

15.     Accordingly, Mr. Saintfelix has complied with all other Title VII and ADAAA requirements and all prerequisites prior to bringing this lawsuit.

## FACTS

### I.     City of Orlando Fire Department Background

16.     In 2020, Mayor Dyer appointed Deputy Chief of Staff Heather Fagan and Public Safety Advisor Dave Arnott and tasked them with "developing strategies for increasing the recruitment of women, minorities and veterans in the fire

department and to develop and implement professional standards policies that ensure the retention of new firefighters." [1]

17.    In February 2020, the COFD announced an Inclusivity & Equity Action Plan that explicitly recognized "significant gaps in recruitment and retention of women firefighters and firefighters of color."[2] This plan demonstrated Defendant's contemporaneous awareness of disparities affecting minority firefighters. [3]

18.    In accordance with the stated Plan, the COFD publicized a desire to increase the number of minority firefighters and undertook recruiting efforts targeting African American and Hispanic candidates. The Defendant's Fire Department offers employment in a wide range of positions, including Firefighter/Paramedic, Firefighter/EMT, and Civilian EMT/Paramedic.

19.    Despite these publicly announced commitments to recruitment and retention of minority firefighters, the Defendant harbored a concealed, contradictory scheme: hire minority firefighters with visible medical conditions incompatible with its unstated and unenforced grooming standards, accommodate them temporarily, then subject them to discriminatory enforcement to manufacture grounds for

---

[1] Orlando Fire Dep't, Inclusivity and Equity Action Plan (Feb. 2020), https://www.or-lando.gov/files/sharedassets/public/v/2/departments/public-safety/ofd/ofdinclusivityandequityac-tionplan2020h.pdf.
[2] *See id.*
[3] *See id.*

termination—all while maintaining a facially neutral policy that was selectively enforced against only African American employees.

20.     To qualify for employment as a Firefighter/Paramedic or Firefighter/EMT, an applicant must possess certain minimum qualifications, including: (1) a Florida State Firefighter certification, (2) completion of the FireTEAM and CPAT testing within twelve months of the application, (3) completion of the Public Safety Self-Assessment (PSSA) Part 1 through the National Testing Network (NTN), (4) possess either an EMT or Paramedic certification, (5) possess a high school diploma, GED, or equivalent; (6) attain the age of 18 years or older, (7) successfully clear a background check (including a drug screening, polygraph, and medical and psychological examinations), (8) possess U.S. Citizenship, (9) possess good moral character, (10) remains in good physical condition, and (11) abstain from use of tobacco products.

21.     Firefighter applicants who are employed as Paramedics are entitled to additional base compensation and incentive pay for those assigned to special teams.

22.     To qualify for employment as a Civilian EMT/Paramedic, an applicant must possess certain minimum qualifications, including: (1) possess a High school diploma or GED equivalency, (2) possess and maintain current State of Florida EMT or Paramedic Certification as a requirement of continued employment, (3) possess and maintain a State of Florida Class E Driver's License, (4) attain the age of 18

years or older, (5) successfully clear a background check (including a drug screening, polygraph, and medical and psychological examinations).

23.  An applicant for the position of Firefighter/Paramedic or Firefighter/EMT automatically possesses the qualifications and experience for the Civilian EMT/Paramedic position. However, applicants for the position of Civilian EMT/Paramedic will not automatically possess the qualifications and experience required for Firefighter/Paramedic or Firefighter/EMT positions, as they do not have firefighter certifications and any Mask Fit Test obligations or regulations did not previously apply to them.

24.  For the Firefighter/Paramedic, Firefighter/EMT, and Civilian EMT/Paramedic positions, successful applicants will begin their employment as probationary employees who must successfully complete an orientation/training.

## II.  Medical Background

25.  PFB is an inflammatory disorder of follicular and perifollicular skin resulting in itchy papules, pustules, post-inflammatory hyperpigmentation, secondary infections from the papules and pustules that have formed, hypertrophic life-long scarring, disfigurement, and keloids.[4] These cosmetic disfigurements caused by PFB significantly limit one's ability to eat, communicate, speak, work,

---

[4] *See* Adebola Ogunbiyi, *Pseudofolliculitis Barbae: Current Treatment Options*, 12 Clin. Cosmet. Investig. Dermatol. 241 (Apr. 16, 2019), https://pmc.ncbi.nlm.nih.gov/articles/PMC6585396/.

and breathe because the chronic irritation caused to the skin on the face, neck, and throat will cause an individual with PFB debilitating pain and discomfort.

26. PFB disproportionately affects Black men (African descent) at a rate of 45 to 83 percent, which is far higher than in other populations. *See* Letter from Rep. Wesley Bell *et al.* to Pete Hegseth, Sec'y of Def. (Oct. 21, 2025), available online at https://bell.house.gov/sites/evo-subsites/bell.house.gov/files/evo-media-document/letter-to-secdef-on-beards-final.pdf; Patricia K. Perry et al., *Defining Pseudofolliculitis Barbae in 2001: A Review of the Literature and Current Trends*, 46 J. Am. Acad. Dermatol. S113 (2002).

27. African American and Haitian men diagnosed with PFB are routinely prescribed antibiotics to prevent secondary infections and are explicitly ordered by medical professionals not to shave with razors or maintain a clean-shaven appearance.

28. Human hair growth occurs in a cyclic manner, involving phases of active growth (anagen) and an inactive state (telogen). *See* Donald Shenenberger et al., *Removal of Unwanted Facial Hair*, 66 Am. Fam. Physician 1907 (2002). Additionally, an intermediate stage of transition, known as catagen, occurs between active growth and the cessation of growth. *See id.* Between 85 and 90 percent of hairs are in the anagen phase at any given time, with the remainder in the telogen phase. *See id.*

29. The Centers for Disease Control and Prevention (CDC) and the National Institute for Occupational Safety and Health (NIOSH) released graphic illustrations showing that facial hairstyles must be assessed against the sealing surfaces of respirators, as shown below:[5]



30. As observed in the CDC graphic, the term "clean-shaven" refers to being without a beard, whiskers, or mustache.

---

[5] The graphic is available at https://www.cdc.gov/niosh/media/pdfs/2024/12/NPPTL_INFO_FacialHairstylesandFFRs_2017.pdf.

31.     As observed in the CDC graphic, the term "stubble" refers to the earliest stage of hair shaft emergence in the anagen (growth) phase of the hair cycle, typically characterized by at least 1mm of hair.

32.     The term "5 o'clock shadow" originated in the 1930s and refers to the heavy stubble that appears when facial hair reappears roughly 8–12 hours after shaving, caused by the continuous mitotic activity of the hair follicle.

33.     Critically, the CDC and NIOSH emphasize that OSHA regulations do not categorically prohibit all facial hair; they prohibit facial hair that "protrudes" between the sealing surface and the wearer's face.

### III.    Plaintiff's Experience

34.     In or around 2018, Mr. Saintfelix was diagnosed by a qualified medical professional with PFB, a disabling condition under the ADAAA.

35.     Between November 2021 and February 2022, Mr. Saintfelix applied for the Firefighter/Paramedic position with the COFD. He met all objective qualifications and submitted the required documentation.

36.     On March 23, 2022, Mr. Saintfelix was invited to schedule a panel interview with the COFD between April 12 and May 3, 2022. This invitation confirmed that Mr. Saintfelix had cleared initial screening and satisfied the minimum qualifications identified by COFD in earlier email communications.

37.     Mr. Saintfelix selected April 14, 2022, as the date for his panel interview.

38.    On the morning of April 14, 2022, Mr. Saintfelix shaved his face in preparation for his panel interview and took a photograph of himself. Because he shaved, early signs of his PFB condition—including bumps and irritation—were visible on his face, cheeks, and neck.

39.    On April 14, 2022, Mr. Saintfelix participated in a panel interview with Executive Deputy Fire Chief Ian Davis, Deputy Fire Chief Kevin Preston, and an unidentified woman who took notes. The interview panel reviewed Mr. Saintfelix's resume and application materials, which contained his name and identified his Haitian descent. Defendant required Mr. Saintfelix to submit to having photographs taken of him during the interview.

40.    The interview panel asked only generic, non-discriminatory interview questions. Notably, EDFC Davis and DFC Preston did not mention, discuss, or inform Mr. Saintfelix of any grooming policy during the interview.

41.    On May 27, 2022, Mr. Saintfelix received a conditional employment offer from the Defendant. This conditional offer explicitly stated that it was contingent upon the successful completion of a medical examination, drug test, psychological examination, polygraph examination, and background investigation. The conditional offer contained no mention of a grooming policy, no facial hair restrictions, and no reference to his visible medical condition.

42. On June 1, 2022, Mr. Saintfelix signed the conditional offer and returned it to the COFD with the required waivers and documentation.

43. On June 3, 2022, Defendant scheduled Mr. Saintfelix's medical examination (including a drug test) to occur on June 10, 2022, Mr. Saintfelix's psychological examination to occur on June 20, 2022, and Mr. Saintfelix's medical polygraph to occur on June 9, 2022.

44. On June 9, 2022, Mr. Saintfelix underwent an OHD Quantifit Respirator Fit Test ("Mask Fit Test") administered by a COFD employee with initials "KK." During this test, Mr. Saintfelix informed KK that he could not be clean-shaven because he had PFB, a documented medical disability, which he confirmed with medical documentation. KK did not refuse to administer the test, did not advise Mr. Saintfelix of any grooming policy, and did not suggest the medical condition would affect his employment.

45. Mr. Saintfelix passed the Mask Fit Test with an overall fit factor of 3,030, which demonstrates that his disability (that he disclosed to KK) did not prevent a proper respirator seal. Later, KK reported the results of the Mask Fit Test to Defendant's Fire Department.

46. Mr. Saintfelix completed all preconditions to employment without any indication from Defendant that his visible medical condition created a hiring barrier or employment problem.

47.     On June 29, 2022, Mr. Saintfelix received a final offer letter from DFC Preston on Defendant's behalf requiring a response. The letter advised that employment would begin on July 18, 2022, for a training period. The final offer contained no mention of a grooming policy, no facial hair restrictions, and no indication that Mr. Saintfelix's medical condition would affect his employment status. During the training period, the letter explained that Mr. Saintfelix fell under the command of the Assistant Chief Paul Plaugher ("AC Plaugher") and an instructor, Lieutenant Aaron Nix ("LT Nix").

48.     Mr. Saintfelix accepted the final offer and reported for duty on July 18, 2022.

49.     On July 18, 2022, Mr. Saintfelix began his employment with Defendant's municipality—City of Orlando Fire Department—as a Firefighter.

50.     When Mr. Saintfelix began employment on July 18, 2022, and on several occasions between then and September 22, 2022, he verbally informed training staff (including Assistant Chief Paul Plaugher, Lieutenant Aaron Nix, Brett Walls, and Heather Davis) of his PFB condition. He provided medical documentation from a February 28, 2022, medical visit that explicitly advised against shaving to the point of being clean-shaven.

51.     The training staff consistently responded to Mr. Saintfelix's requests for accommodation by telling him he would be "okay" and that he just needed to "keep

his paperwork." This response constituted an implied grant of accommodation: permission to maintain facial hair (at a minimum, stubble) to accommodate his documented medical condition.

52. Throughout the training period (July 18–September 23, 2022), Mr. Saintfelix received no complaints, no write-ups, no policy violations, and no discipline regarding his facial hair or appearance from any COFD leadership, supervisors, or training staff.

53. During training, Mr. Saintfelix observed white and Hispanic firefighters in his cohort maintaining mustaches, goatees, beards, and "5 o'clock shadow" without any apparent restrictions or complaints. These observations, combined with the tacit approval from AC Plaugher and LT Nix, reinforced Mr. Saintfelix's reasonable understanding that Defendant had granted him an accommodation.

54. With the accommodation, Mr. Saintfelix was able to perform all job functions without any undue hardship to Defendant, including passing every Mask Fit Test and satisfying the general obligations of the Firefighter/Paramedic position.

55. On September 23, 2022, Mr. Saintfelix successfully completed training and graduated from New Hire Class 0722. EDFC Davis, acting at the direction of COFD leadership, approached Mr. Saintfelix and made unsolicited comments about his facial condition. Mr. Saintfelix explained his PFB disability directly to EDFC Davis and reiterated his need for accommodation.

56.     Notably, EDFC Davis did not approach any of Mr. Saintfelix's peers in New Hire Class 0722 who had facial hair inconsistent with EDFC Davis's stated concerns. A photograph posted on the COFD's official Instagram account and produced herein shows multiple white and Hispanic firefighters in Mr. Saintfelix's cohort maintaining facial hair, yet none of them were subject to similar scrutiny or commentary. A true and accurate copy of COFD's Instagram post is reproduced in Figure 1 below:



orlandofiredept ✓                                              • • •

♡ 247    ◯ 3    ⟲    ◁                                    ⬚

**orlandofiredept** We're pleased to introduce New Hire Class 0722.
Welcome to OFD! More photos to come highlighting our newest
members.

September 23, 2022

[Figure 1]

57.    In the following days, EDFC Davis made it his mission to make Mr.
Saintfelix's employment unbearable because of his request for a reasonable
accommodation.

58.    On September 29, 2022, while Mr. Saintfelix was suffering from a
secondary skin infection due to his PFB (a foreseeable medical consequence of the

condition), EDFC Davis publicly humiliated him during an operational shift providing hurricane relief assistance. EDFC Davis made the following discriminatory statements to Mr. Saintfelix:

a. "I know what PFB looks like, and yours doesn't look like it" (a medically baseless statement contradicted by Mr. Saintfelix's visible condition and medical documentation);

b. Because you are African American, the only reason you are here is because of me (explicit race-based discrimination);

c. No accommodation will be granted because you will "abuse it" (refusal to engage in the interactive process);

d. "You won't make it out of your probationary period with your face looking like that" (threat of termination conditioned on changing his medical condition).

59.     EDFC Davis's statement that Mr. Saintfelix was hired solely because of his race, coupled with the immediate withdrawal of his accommodation, reveals the discriminatory motive animating Defendant's conduct. EDFC Davis was making clear that while Defendant had hired minorities to publicly satisfy its Inclusivity & Equity Action Plan, it was a sham and Defendant harbored no intention of genuinely accommodating minority employees who are disproportionately likely to have medical conditions such as PFB.

60.     On October 1, 2022, at the direction and under the supervision of COFD leadership, EDFC Davis established a policy requiring Mr. Saintfelix to undergo daily facial hair screenings upon reporting for duty. No such screening protocol was

established for any other firefighter in the department, and no such protocol was applied to white or Hispanic firefighters with visible facial hair.

61.    On October 2, 2022, a member of COFD leadership (identified as a friend of EDFC Davis) left a voicemail on Mr. Saintfelix's phone attempting to coerce his compliance with EDFC Davis and, by extension, COFD's demands. Mr. Saintfelix called back and issued a verbal complaint that EDFC Davis was fabricating insubordination claims to disguise unlawful discrimination, harassment, and targeting.

62.    On October 3, 2022, Lieutenant Jacquelyn Pollock ("LT Pollock") left a voicemail confirming that EDFC Davis's demands had been adopted and ratified by COFD leadership, when she stated, "The verdict is that you are to be clean-shaven while on duty." This statement demonstrates that senior leadership explicitly endorsed the discriminatory enforcement being directed at Mr. Saintfelix—and only Mr. Saintfelix. LT Pollock ended the voicemail by stating, "If you have any questions on that, or concerns, you can call me back or send me an email."

63.    On October 4, 2022, Mr. Saintfelix obtained an updated medical letter from his healthcare provider, which explicitly stated his medical condition and requested that he be permitted to forgo close shaving. He submitted this letter to COFD leadership through proper channels.

64.     Two days later, on October 6, 2022, EDFC Davis and Chief Craig Hulette personally inspected Mr. Saintfelix's facial hair. EDFC Davis declared his condition "unacceptable" and stated, "Because I hired you, I can fire you. You need to fall in line." Chief Hulette was physically present, observed these remarks, and through his presence, impliedly authorized, ratified, and rubberstamped EDFC Davis's discriminatory.

65.     Twenty-six days after Mr. Saintfelix resubmitted his medical documentation requesting a reasonable accommodation, on October 30, 2022.

66.     Also, on October 30, 2022, Mr. Saintfelix shaved before reporting for duty and underwent an inspection by District Chief Creed McClelland at 8:00 a.m. DC McClelland cleared him to work.

67.     Later that same afternoon, on October 30, 2022, LT Pollock (acting at the direction of COFD leadership) re-inspected Mr. Saintfelix at 2:00 p.m. and demanded that he shave again or be sent home. Mr. Saintfelix directly opposed her unlawful request based on his medical provider's advice, his prior approval from DC McClelland, and COFD permitting white and Hispanic comparators to maintain facial hair. LT Pollock sent him home after issuing a field inquiry write-up for one violation of the Rules and Regulations.

68.     Rather than correct LT Pollock's contradictory and retaliatory action, DC McClelland rubberstamped the write-up on October 31, 2022, despite having

personally cleared Mr. Saintfelix for duty that same morning. Assistant Chief Fussell also ratified the write-up.

69. The pattern reveals coordination: conflicting inspections (morning clearance, afternoon discipline) designed to manufacture a paper trail of "violations" justifying eventual termination.

70. On his way home, Mr. Saintfelix captured photographs of his facial condition. Mr. Saintfelix then emailed LT Pollock (as she had indicated on her voicemail) and DC Creed to request a reasonable accommodation in writing, emphasizing that he wanted to perform his day-to-day functions.

71. On November 2, 2022, Mr. Saintfelix reported for duty and was inspected by LT Pollock, who again demanded that he shave and threatened discipline. Mr. Saintfelix opposed her request again and reiterated his medical condition and his prior medical documentation. LT Pollock issued a second write-up citing five (5) separate violations of Rules & Regulations. These citations were subterfuge concealing the true, discriminatory basis for discipline: Mr. Saintfelix's refusal to comply with an unlawful, unwritten, and selectively enforced grooming requirement.

72. Critically, it was not until November 2, 2022—three days into the write-up campaign—that LT Pollock informed Mr. Saintfelix that his request for a reasonable accommodation, made on October 30, 2022, had been formally denied.

This timeline demonstrates that Defendant never engaged in a meaningful interactive process, never analyzed whether any accommodations were feasible, and never evaluated alternatives implicit in his request. Mr. Saintfelix was permitted to remain on shift after receiving the second write-up from LT Pollock.

73. LT Pollock's second write-up was ratified by the same decision-makers as before, creating a falsified documentary record suggesting legitimate disciplinary bases in the event COFD elected to explore a subsequent termination.

74. Defendant had no legitimate business justification for its sudden desire to enact a clean-shaven policy prohibiting "beards, goatees, and other facial hair." Indeed, Mr. Saintfelix was not aware of, nor did he become aware of, any clean-shaven policy until after he was hired and his prior accommodation was withdrawn. Defendant's policy, if it even existed, was never applied or enforced because white and Hispanic firefighters were permitted to wear all forms of facial hair, 5 o'clock shadows, and stubble as reflected by publicly available pictures on COFD's Instagram account and reproduced in Figures 2 and 3 below:



[Figure 2]



orlandofiredept ✓                                    •••

1/10

♡ 687   ☐ 4   ⟲   ▽                              🔖

orlandofiredept We joined several public safety agencies to honor those who lost their lives on September 11, 2001. For the past 10 years, our members have climbed 110 floors at the City... more

September 12, 2022

[Figure 3]

75.    On November 5, 2022, LT Pollock inspected Mr. Saintfelix again and, despite no material change in his condition, issued a third write-up using language indistinguishable from the second write-up.  Mr. Saintfelix was permitted to remain on shift after receiving the third write-up from LT Pollock.

76. LT Pollock's third write-up was ratified by District Chief Joseph Tardigno and Assistant Chief Fussell

77. Chief Hulette intentionally altered the date of LT Pollock's second write-up from November 2, 2022 (the actual date) to November 7, 2022, to disguise the fact that Mr. Saintfelix was being railroaded with consecutive write-ups in a discrimination campaign. This falsification of records demonstrates consciousness of guilt and intent to manufacture a pretext.

78. Without affording Mr. Saintfelix an opportunity to respond or contest the write-ups, Chief Hulette sustained all three write-ups on the same day— November 7, 2022. He issued separate letters to Mr. Saintfelix providing verbal and written reprimands for the first two write-ups, a written censure and 12-hour suspension for the third write-up, and notice of appeal rights.

79. On November 11, 2022, at the start of Mr. Saintfelix's scheduled shift, LT Pollock again inspected him. Mr. Saintfelix opposed this practice again and requested a copy of his Mask Fit Test results, as well as the results of his peers, to bolster his position that he could safely maintain minimal facial hair while passing respirator fit tests, just like his white and Hispanic peers have been able to do. LT Pollock refused and later left a voicemail denying the request, stating that she had to take the matter up through the chain of command. To this date, Mr. Saintfelix has

never received the Mask Fit Test results from COFD that would have supported his reasonable accommodation request.

80.     LT Pollock continued write-ups for Mr. Saintfelix's November 11 and 14, 2022 shifts. Chief Hulette ordered two additional 96-hour suspensions, depriving Mr. Saintfelix of contractually authorized compensation.

81.     By late November 2022, Mr. Saintfelix had endured:

    a.     Discriminatory remarks linking his hiring to his race;

    b.     Sudden withdrawal of an implied accommodation after successful performance;

    c.     Daily discriminatory inspections applied only to him;

    d.     Escalating, unsubstantiated write-ups within a 13-day period;

    e.     One 12-hour suspension without pay;

    f.     Two 96-hour suspensions without pay;

    g.     Denial of documentary evidence supporting his accommodation request; and

    h.     A coordinated scheme orchestrated by COFD leadership to force his resignation.

82.     On November 21, 2022, Mr. Saintfelix met with IAFF Local 1365 and an attorney to discuss the unlawful discrimination and retaliation he endured.

83.     On November 26, 2022, facing intolerable working conditions, public humiliation, unjustified discipline, and a hostile environment, Mr. Saintfelix

resigned from his position. His resignation was constructively forced by Defendant's intentional campaign to make his continued employment intolerable.

84.     IAFF Local 1365 proceeded on Mr. Saintfelix's behalf to pursue grievances under the collective bargaining agreement. On December 19, 2022, Fire Chief Salazar denied Mr. Saintfelix's grievance at Step three.

85.     After Mr. Saintfelix's constructive termination, EDFC Davis contacted Mr. Saintfelix's current employer and made false statements about him, including that he willfully refused to comply with Orlando Fire Department rules and intentionally committed misconduct. These false statements were designed to damage Mr. Saintfelix's professional reputation and prevent his employment prospects in the firefighting profession.

86.     Throughout the investigation and discovery in this matter, evidence will demonstrate that white and Hispanic firefighters in Mr. Saintfelix's cohort maintained facial hair—including beards, mustaches, goatees, and 5 o'clock shadows—without being subjected to daily inspections, write-ups, or disciplinary action. Specifically, white and Hispanic firefighters, including Alexander Betancourt, Jaycen Flannagin, Craig Jaramillo, Garrett Mueller, Edward Ramos Lopez, Alec Ribbink, and Andrew Strebeck, were not subjected to the facial hair enforcement measures applied exclusively to Mr. Saintfelix.

87.    This selective enforcement against Mr. Saintfelix—the only African American, Haitian firefighter in his cohort with a documented medical condition—demonstrates that Defendant's asserted grooming "policy" was a pretext for disability, race and national origin discrimination.

## COUNT I
### Intentional Disability Discrimination in Violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12181 et seq.

88.    Mr. Saintfelix repeats and incorporates paragraphs 1–87 above as though fully set forth herein.

89.    Mr. Saintfelix is a member of a protected class under the ADA.

90.    Mr. Saintfelix is disabled within the meaning of the ADAAA because he suffers from Pseudofolliculitis Barbae, a physiological condition causing persistent inflammation, infection, scarring, and disfigurement when he shaves. This condition substantially limits major life activities, including eating, grooming, communicating, speaking, working, and breathing. 42 U.S.C. § 12102.

91.    Mr. Saintfelix was a "qualified individual" because he met all objective minimum qualifications for the Firefighter/Paramedic position, including satisfying all certifications, background checks, fitness requirements, and passing every Mask Fit Test designed to assess respirator safety. 42 U.S.C. § 12111.

92.     Defendant City of Orlando, through the COFD, is a covered employer with 15 or more employees and was at all material times an "employer" under the ADA.

93.     Defendant intentionally discriminated against based on his disability by:

a.     Granting him an implied accommodation during his training period, thereby demonstrating knowledge of his disability and acceptance of his ability to work with the accommodation;

b.     Suddenly and without analysis, investigation, or legitimate business justification, revoking that accommodation after he completed training;

c.     Refusing to engage in an interactive process to determine whether the accommodation was necessary or whether alternatives existed;

d.     Denying his repeated, documented requests for accommodation despite his medical provider's explicit recommendations;

e.     Subjecting him to daily discriminatory inspections not applied to other employees;

f.     Issuing unsubstantiated write-ups designed to manufacture a disciplinary record;

g.     Suspending him without pay in retaliation for his disability-related requests;

h.     Creating and maintaining a hostile work environment based on his disability;

94.     Defendant was deliberately indifferent to Mr. Saintfelix's right to an accommodation for his disability because:

a. Defendant had actual knowledge of Mr. Saintfelix's disability from the panel interview forward (visible symptoms, medical documentation provided during pre-employment testing, and disclosure during the pre-hire Mask Fit Test); .

b. Defendant hired Mr. Saintfelix notwithstanding this known disability, demonstrating that the disability did not prevent job performance;

c. Defendant's sudden revocation of the accommodation was made with actual knowledge that Mr. Saintfelix had a disability;

d. Defendant made no assessment of whether the requested accommodation was feasible and necessary or whether less restrictive alternatives existed;

95. Mr. Saintfelix suffered adverse employment actions as a result of Defendant's discrimination.

96. As a direct and proximate result of the discrimination described above, Mr. Saintfelix has suffered and continues to suffer loss of employment, loss of base compensation, loss of incentive pay, reputational damage, and loss of other employment benefits. Unless enjoined by an order of this Court, Defendant will continue to pursue policies and practices that fail to accommodate disabled persons.

97. **WHEREFORE**, Mr. Saintfelix demands judgment for lost wages/back pay, benefits, including lost retirement, front pay, emotional distress damages, including but not limited to damage to Mr. Saintfelix's reputation and all other compensatory damages allowable under law, costs, punitive damages, and any other relief that the Court deems just and proper.

## COUNT II
### Disparate Treatment in Violation of the
### Americans with Disabilities Act, 42 U.S.C. §§ 12181 et seq.

98.   Mr. Saintfelix repeats and incorporates paragraphs 1–87 above as though fully set forth herein.

99.   Mr. Saintfelix is a member of a protected class under the ADA.

100.   Mr. Saintfelix is disabled within the meaning of the ADAAA because he suffers from Pseudofolliculitis Barbae, a physiological condition causing persistent inflammation, infection, scarring, and disfigurement when he shaves. This condition substantially limits major life activities, including eating, grooming, communicating, speaking, working, and breathing. 42 U.S.C. § 12102.

101.   Mr. Saintfelix was a "qualified individual" because he met all objective minimum qualifications for the Firefighter/Paramedic position, including satisfying all certifications, background checks, fitness requirements, and passing every Mask Fit Test designed to assess respirator safety. 42 U.S.C. § 12111.

102.   Defendant City of Orlando, through the COFD, is a covered employer with 15 or more employees and was at all material times an "employer" under the ADA.

103.	Defendant had actual knowledge of Mr. Saintfelix's disability from the panel interview forward (visible symptoms, medical documentation provided during pre-employment testing, and disclosure during the pre-hire Mask Fit Test).

104.	Defendant unilaterally revoked Mr. Saintfelix's prior accommodation after he completed orientation/training. Defendant did not revoke any accommodations provided for other disabilities or otherwise punish non-disabled persons.

105.	As alleged herein, Defendant's actions and inactions affected the "terms, conditions or privileges" of Mr. Saintfelix's employment as outlined in the ADAAA.

106.	Mr. Saintfelix suffered sufficiently severe and pervasive treatment because of his disability and requests for accommodations regarding same.

107.	Defendant's actions, by and through its agents and employees, violated Mr. Saintfelix's rights against disability discrimination under the ADAAA.

108.	Mr. Saintfelix suffered adverse employment actions as a result of Defendant's discrimination on the account of his disability.

109.	Defendant's actions and inactions were deliberate and willful.

110.	As a direct and proximate result of the discrimination described above, Mr. Saintfelix has suffered and continues to suffer loss of employment, loss of base compensation, loss of incentive pay, reputational damage, and loss of other

employment benefits. Unless enjoined by an Order of this Court, Defendant will continue to pursue policies and practices that fail to accommodate disabled persons.

111. **WHEREFORE**, Mr. Saintfelix demands judgment for lost wages/back pay, benefits, including lost retirement, front pay, emotional distress damages, including but not limited to damage to Mr. Saintfelix's reputation and all other compensatory damages allowable under law, costs, punitive damages, and any other relief that the Court deems just and proper.

## COUNT III
### Failure to Provide a Reasonable Accommodation in Violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12181 et seq.

112. Mr. Saintfelix repeats and incorporates paragraphs 1–87 above as though fully set forth herein.

113. Mr. Saintfelix is disabled within the meaning of the ADAAA because he suffers from Pseudofolliculitis Barbae, a physiological condition causing persistent inflammation, infection, scarring, and disfigurement when he shaves. This condition substantially limits major life activities, including eating, grooming, communicating, speaking, working, and breathing. 42 U.S.C. § 12102 of the ADA.

114. Mr. Saintfelix was a "qualified individual" because he met all objective minimum qualifications for the Firefighter/Paramedic position, including satisfying all certifications, background checks, fitness requirements, and passing every Mask Fit Test designed to assess respirator safety. 42 U.S.C. § 12111.

115. Defendant City of Orlando, through the COFD, is a covered employer with 15 or more employees and was at all material times an "employer" under the ADA.

116. Mr. Saintfelix's need for a reasonable accommodation was clear and obvious, such that it did not need to be requested, as his disability was visible on his face, cheeks, or neck from the panel interview forward.

117. Despite being clear and obvious, Mr. Saintfelix alerted Defendant to his disability when he provided medical documentation during the pre-hire Mask Fit Test and during post-hire training, when he made explicit oral requests for accommodation, and when he submitted written medical documentation on October 4, 2022.

118. Defendant initially accommodated Mr. Saintfelix by permitting him to maintain stubble (early anagen phase facial hair) during training. This accommodation caused no undue hardship because he performed all job functions, received no performance-related complaints, passed every Mask Fit Test, and completed training without complaints.

119. Defendant unilaterally revoked Mr. Saintfelix's prior accommodation after he completed orientation/training.

120. Before learning that Defendant had unilaterally revoked Mr. Saintfelix's prior accommodation, Mr. Saintfelix again requested a reasonable accommodation,

but this time for an accommodation that accounted for his desire to continue some of his day-to-day functions—i.e., reassignment to the Civilian EMT/Paramedic position (exempt from the grooming policy).

121. Defendant refused to engage in the interaction process and unreasonably denied Mr. Saintfelix's request for a reasonable accommodation. By the conduct described above, Defendant failed to accommodate Mr. Saintfelix because of Mr. Saintfelix's disability.

122. Defendant's stated reason for denying accommodation—clean-shaven policy—is pretextual because such a policy forecloses any facial hair on the face, and Defendant permitted non-disabled employees to evade that policy.

123. Several reasonable accommodations were available to Defendant and included: permission to maintain minimal facial hair (1–3mm) consistent with Mr. Saintfelix's prior accommodation (subject to passing Mask Fit Tests), reassignment to the Civilian EMT/Paramedic position (for which he was automatically qualified), which has no grooming requirement, and medical leave while exploring treatment options for PFB.

124. Defendant failed to provide a reasonable accommodation in violation of the ADA.

125. **WHEREFORE**, Mr. Saintfelix demands judgment for lost wages/back pay, benefits, including lost retirement, front pay, emotional distress damages,

including but not limited to damage to Mr. Saintfelix's reputation and all other compensatory damages allowable under law, costs, punitive damages, and any other relief that the Court deems just and proper.

### COUNT IV
### Retaliation in Violation of the
### Americans with Disabilities Act, 42 U.S.C. §§ 12181 et seq.

126. Mr. Saintfelix repeats and incorporates paragraphs 1–87 above as though fully set forth herein.

127. At all times relevant hereto, Mr. Saintfelix was disabled under the ADA.

128. Mr. Saintfelix engaged in protected activity by: (a) requesting accommodations for his disability (verbally and in writing); (b) submitting medical documentation that independently requested an accommodation and that supported his written and verbal accommodation requests; (c) opposing unlawful employment practices by continuing to report to work and asserting his legal rights, requesting the Mask Fit Test results of his peers, and issuing verbal complaints.

129. Defendant knew or should have known that Mr. Saintfelix was engaging in protected activity asserting his rights under the ADA.

130. As alleged herein, Defendant retaliated against Mr. Saintfelix for engaging in protected activity when COFD: (a) made discriminatory statements to Mr. Saintfelix; (b) suddenly revoked his prior accommodation; (c) subjected him to

daily discriminatory inspections; (d) issued escalating, unsubstantiated write-ups; (e) imposed suspensions without pay; (f) forced his constructive termination; and (g) contacted his new employer and making false statements.

131. The adverse actions were causally related to his protected activity (accommodation requests) based on their timing and they would not have occurred but for Mr. Saintfelix's assertion of his ADA rights.

132. **WHEREFORE**, Mr. Saintfelix prays this Court award judgment in his favor against Defendant for compensatory damages, including back pay, front pay (or reinstatement), and damages for emotional distress, pain and suffering, reputational damage, and mental anguish, pre- and post-judgment interest, costs, punitive damages, and such other relief as this Court deems proper.

## COUNT V
### Race Discrimination in Violation of
### Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.)

133. Mr. Saintfelix repeats and incorporates paragraphs 1–87 above as though fully set forth herein.

134. Mr. Saintfelix is a Black/African American male and is a member of a protected class under Title VII.

135. Mr. Saintfelix was "qualified" because he met all objective minimum qualifications for the Firefighter/Paramedic position, including satisfying all

certifications, background checks, fitness requirements, and passing every Mask Fit Test designed to assess respirator safety.

136. Defendant City of Orlando, by and through the City of Orlando Fire Department, discriminated against Mr. Saintfelix on the account of his race.

137. As alleged herein, Mr. Saintfelix was subjected to intentional race discrimination because (a) EDFC Davis explicitly stated that "the only reason you were hired is because you're Black;" (b) COFD refused to grant Mr. Saintfelix's request for an accommodation because, as the only Black person to request an accommodation, COFD viewed that Mr. Saintfelix would "abuse" it; (c) COFD subjected only Mr. Saintfelix to daily inspections; (d) COFD issued write-ups only to Mr. Saintfelix for facial hair visible on similarly situated white and Hispanic firefighters who were not disciplined; (e) Chief Hulette altered records to disguise the pattern of discrimination, and (f) COFD leadership (Chief Hulette and others) authorized, ratified, rubberstamped and participated in discriminatory conduct.

138. Alternatively, and as alleged herein, Defendant engaged in disparate impact race discrimination because: (a) COFD knew or should have known that PFB disproportionately affects African American and Haitian men at rates of 45–83 percent; (b) COFD's selective enforcement of facial hair standards fell disproportionately on Black men with PFB; (c) COFD applied the grooming standard selectively, enforcing it against Mr. Saintfelix (Black) but not against white

and Hispanic employees with visible facial hair; (d) COFD had no legitimate, non-discriminatory business justification for selective enforcement (there was no written, public, or consistently applied policy).

139. Defendant treated similarly situated white and Hispanic firefighters (Betancourt, Flannagin, Jaramillo, Mueller, Lopez, Ribbink, Strebeck) more favorably by permitting them to maintain facial hair without inspection, write-ups, or discipline.

140. Mr. Saintfelix suffered several adverse employment actions based on Defendant's unlawful discrimination, including further discrimination, harassment, and hostility (including unsubstantiated write-ups) that culminated in Mr. Saintfelix's constructive termination.

141. Because Defendant acted intentionally or with gross disregard for Mr. Saintfelix's rights under Title VII, Defendant is liable for punitive damages.

142. **WHEREFORE**, Mr. Saintfelix demands judgment for lost wages/back pay, benefits, including lost retirement, front pay, emotional distress damages, including but not limited to damage to Mr. Saintfelix's reputation, and all other compensatory damages allowable under law, costs, punitive damages, and any other relief that the Court deems just and proper.

## COUNT VI
### National Origin Discrimination in Violation of
### Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.)

143. Mr. Saintfelix repeats and incorporates paragraphs 1–87 above as though fully set forth herein.

144. Mr. Saintfelix is Haitian-born and is a member of a protected class under Title VII.

145. Mr. Saintfelix was "qualified" because he met all objective minimum qualifications for the Firefighter/Paramedic position, including satisfying all certifications, background checks, fitness requirements, and passing every Mask Fit Test designed to assess respirator safety.

146. Defendant City of Orlando, by and through the City of Orlando Fire Department, discriminated against Mr. Saintfelix on the account of his national origin.

147. As alleged herein, Mr. Saintfelix was subjected to national origin discrimination because (a) COFD knew or should have known of his Haitian descent from his resume, application materials (including his high school diploma), and name (b) EDFC Davis made statements implying Mr. Saintfelix would "abuse" accommodations if granted—a stereotype applied based on national origin; (c) COFD subjected Mr. Saintfelix to discriminatory enforcement while permitting American-born and Hispanic employees with similar facial hair to work without

discipline; (d) Chief Hulette altered records to disguise the pattern of discrimination; and (e) COFD systematically excluded a Haitian-born minority from genuine inclusion in the COFD despite public commitments to diversity.

148. Alternatively, Defendant engaged in disparate impact national origin discrimination by selectively enforcing grooming standards against a Haitian-born employee while not enforcing the same standards against others.

149. Defendant treated similarly situated white, American, and Hispanic firefighters (Kendrell Pinkston (Black American), Betancourt, Flannagin, Jaramillo, Mueller, Lopez, Ribbink, Strebeck) more favorably by permitting them to maintain facial hair without inspection, write-ups, or discipline.

150. Mr. Saintfelix suffered several adverse employment actions based on Defendant's unlawful discrimination, including further discrimination, harassment, and hostility (including unsubstantiated write-ups) that culminated in Mr. Saintfelix's constructive termination.

151. Because Defendant acted intentionally or with gross disregard for Mr. Saintfelix's rights under Title VII, Defendant is liable for punitive damages.

152. **WHEREFORE**, Mr. Saintfelix demands judgment for lost wages/back pay, benefits, including lost retirement, front pay, emotional distress damages, including but not limited to damage to Mr. Saintfelix's reputation, and all other

compensatory damages allowable under law, costs, punitive damages, and any other relief that the Court deems just and proper.

## COUNT VII
### Retaliation in Violation of Title VII of the Civil Rights Act of 1964
### (42 U.S.C. § 2000e et seq.)

153. Mr. Saintfelix repeats and incorporates paragraphs 1–87 above as though fully set forth herein.

154. Mr. Saintfelix is a Haitian-born Black man, and, as such, is a member of classes protected under Title VII.

155. Mr. Saintfelix was "qualified" because he met all objective minimum qualifications for the Firefighter/Paramedic position, including satisfying all certifications, background checks, fitness requirements, and passing every Mask Fit Test designed to assess respirator safety.

156. Defendant City of Orlando, by and through the City of Orlando Fire Department, is a covered employer under Title VII because it employs 15 or more persons.

157. As alleged herein, Mr. Saintfelix engaged in protected activity by: (a) making informal complaints to COFD leadership about harassment and unlawful treatment based on his race and national origin and (b) opposing Defendant's discriminatory practices.

158. Defendant knew or should have known of Mr. Saintfelix's protected activity.

159. Defendant retaliated against Mr. Saintfelix by subjecting him to adverse employment actions—write-ups, suspensions, and constructive termination—which would not have occurred absent his protected activity.

160. The adverse employment actions were causally related to Mr. Saintfelix's engagement in a protected activity (based on timing and their direct reference to his conduct) in opposing and making complaints about unlawful employment practices.

161. **WHEREFORE**, Mr. Saintfelix prays this Court award judgment in his favor against Defendant for compensatory damages, including back pay, front pay (or reinstatement), and damages for emotional distress, pain and suffering, reputational damage, and mental anguish, pre- and post-judgment interest, costs, punitive damages, and such other relief as this Court deems proper.

### COUNT VIII
### Breach of Contract under Florida Law

162. Mr. Saintfelix repeats and incorporates paragraphs 1–87 above as though fully set forth herein.

163. Mr. Saintfelix and Defendant entered into a valid, enforceable employment contract on June 29, 2022, when Defendant issued the final offer of employment

164. This contract incorporated all subsequent paychecks and the express and implied terms of COFD employment.

165. The contract imposed reciprocal obligations: Mr. Saintfelix would perform his job duties, and Defendant would provide compensation and maintain a non-discriminatory work environment.

166. Defendant breached its duties under the contract by:

    a.    Willfully and intentionally obstructing Mr. Saintfelix's ability to perform job duties (subjecting him to daily inspections, issuing pretextual write-ups, and suspending him);

    b.    Suspending him without pay;

    c.    Constructively terminating his employment by creating an intolerable hostile work environment.

167. Mr. Saintfelix fully performed his obligations under the contract.

168. As a direct and proximate result of Defendant's breach, Mr. Saintfelix has suffered loss of wages, benefits, and other damages.

169. **WHEREFORE**, Mr. Saintfelix prays this Court award judgment in his favor against Defendant for compensatory damages, including lost wages and benefits, and any other relief that the Court deems just and proper.

## COUNT IX
### Fraudulent Inducement under Florida Law

170. Mr. Saintfelix repeats and incorporates paragraphs 1–87 above as though fully set forth herein.

171. Between March 23, 2022, and June 29, 2022, Defendant was in active communication with Mr. Saintfelix regarding his candidacy for employment, culminating in a final offer on June 29, 2022.

172. During the hiring process, Defendant's agents and representatives— EDFC Davis, DFC Preston, and the Mask Fit Test administrator (KK)—knew of the existence of a grooming standard requiring a clean-shaven appearance.

173. COFD, by and through EDFC Davis, DFC Preston, and the Mask Fit Test administrator (KK), made omissions of material fact by (a) failing to disclose any grooming policy during the panel interview; (b) failing to disclose any grooming policy during pre-employment testing; (c) failing to disclose the policy in the conditional offer or final offer; and (d) permitting Mr. Saintfelix to navigate the entire hiring process under the false belief that his visible medical condition was acceptable to Defendant.

174. The non-disclosure of a grooming policy conflicting with Mr. Saintfelix's documented medical condition constituted a material misrepresentation by omission because Mr. Saintfelix would not have continued the hiring process had he known a clean-shaven requirement would be imposed without accommodation for his medical condition.

175. The non-disclosure of a grooming policy conflicting with Mr. Saintfelix's documented medical condition constituted a material misrepresentation

by omission because Defendant's agents possessed knowledge, experience, position, and tenure within COFD that Mr. Saintfelix lacked.

176. The non-disclosure of a grooming policy conflicting with Mr. Saintfelix's documented medical condition constituted a material misrepresentation by omission because Defendant had a duty to disclose material facts affecting his employment eligibility.

177. EDFC Davis knew or should have known that the existence of a grooming policy that conflicted with Mr. Saintfelix's medical condition was a material fact to Mr. Saintfelix that should have been disclosed.

178. DFC Preston knew or should have known that the existence of a grooming policy that conflicted with Mr. Saintfelix's medical condition was a material fact to Mr. Saintfelix that should have been disclosed.

179. Mask Fit operator KK knew or should have known that the existence of a grooming policy that conflicted with Mr. Saintfelix's medical condition was a material fact to Mr. Saintfelix that should have been disclosed.

180. Defendant's agents intentionally withheld information to lure Mr. Saintfelix into employment, thereby superficially inflating the number of minority firefighters employed by COFD (consistent with the Inclusivity & Equity Action Plan).

181. Mr. Saintfelix justifiably relied on Defendant's omissions by continuing through the hiring process, accepting the final offer, and reporting for duty

182. Mr. Saintfelix would not have continued the hiring process if he had known that COFD had a grooming policy that foreclosed any exemptions for applicants with PFB, although several exemptions existed (including a near-close shave and/or reassignment to a Civilian EMT/Paramedic position).

183. As a result of the fraudulent omissions, Mr. Saintfelix suffered damages, including loss of wages, benefits, emotional distress, and reputational harm.

184. **WHEREFORE**, Mr. Saintfelix prays this Court award judgment in his favor against Defendant for damages that would restore Mr. Saintfelix to the position he would have enjoyed but for the fraud, interests, costs, fees, and any other relief that the Court deems just and proper.

## PRAYER FOR RELIEF

**THEREFORE**, Mr. Saintfelix respectfully requests the following relief:

1. For an order finding in favor of Mr. Saintfelix and against Defendant on all counts asserted herein;

2. For an order awarding Mr. Saintfelix all compensatory damages to which he is entitled;

3. For an order awarding Mr. Saintfelix all punitive damages to which he is entitled to reflect the seriousness of the federal violations;

4. For an order declaring that Mr. Saintfelix's rights were violated and that reinstatement would be proper or, in lieu of reinstatement, award him front pay including benefits;

5. For an order awarding Mr. Saintfelix reimbursement of all attorney's fees and costs incurred in connection with this action;

6. For an order enjoining Defendant from continuing its unlawful practices;

7. For an order awarding Mr. Saintfelix pre- and post-judgment interest;

8. For an order awarding Mr. Saintfelix any other relief, the Court determines is just and proper.

## JURY DEMAND

Mr. Saintfelix demands a trial by jury on all claims properly triable by a jury.

Dated: December 15, 2025

Respectfully submitted,

Billy Saintfelix
125 E. Pine Street, #1510
Orlando FL 32801
Billiam1192@gmail.com